14048

L. D. JENNINGS CO., INC., *ET AL.* v. NORTH RIVER INS. CO.

(179 S. E., 621)

*Messrs. Joseph L. Nettles* and *Shepard K. Nash,* for appellant,

*Messrs. L. D. Jennings, A. S. Merrimon* and *Raymon Schwartz,* for respondents.

April 18, 1935.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This action was brought to enforce the payment of an award claimed by the L. D. Jennings Company, hereinafter referred to as plaintiff, to have been made in accordance with the terms of a policy issued it by the North River Insurance Company. The complaint alleged that on January 21, 1932, the defendant insured the plaintiff against all direct loss, not exceeding $2,500.00, through damage by fire to certain household goods and effects named in the policy; that on December 1, 1932, the property was partially destroyed by fire, and thereafter the insured gave due notice to the defendant of its loss, proofs thereof being furnished as required; that the defendant, after investigation, refused to pay the amount claimed, but demanded an appraisal as provided by the policy, to which the plaintiff agreed; that the parties then entered into a written agreement appointing appraisers "for the purpose of ascertaining and fixing the sound value of the said property and the amount of said loss and damage"; that each party named one appraiser, and these two selected an umpire, whose duty it was "to act with them in matters of difference only"; that the appraisers were unable to agree as to the amount of the loss, and the award was finally made by the appraiser appointed by the plaintiff and the umpire, who fixed the value of the property at the time of the fire at $5,189.05, and the damage at $3,418.95, which the insurance company refused to pay.

The defendant, answering, admitted the issuance of the policy, that the property was partially damaged by fire, and that an agreement for submission and award was entered into upon the demand of the insurer; but alleged that the award as made was invalid and should be set aside as of no effect for the reasons, in substance, that the appraiser named by the insured accepted as true and correct the figures submitted by the plaintiff of the costs of the property insured, its value at the time of the fire, and the damage done; that he refused to make any inquiry as to these

matters, and made no effort to verify the correctness of the figures furnished the assured; that he refused to co-operate with the appraiser named by the defendant, in an effort to arrive at a decision pertaining to such matters, so that the two appraisers might then submit their differences to the umpire for settlement by him in accordance with the terms of the appraisal agreement, but on the contrary, the appraiser appointed by the insured called in the umpire and these two acting together fixed the award, all without any investigation on the part of the umpire whatever.

The plaintiff demurred to the answer on the ground that it did not state facts sufficient to constitute a defense, stating with particularity wherein it failed to do so. Judge Stoll, who heard the matter, sustained the demurrer; but on appeal to this Court the judgment was reversed as to the defense above set out. See *L. D. Jennings Co., Inc., et al. v. North River Insurance Co.*, 171 S. C., 548, 172 S. E., 700.

The case thereafter came on for trial before Judge Oxner and a jury, and resulted in a verdict for the plaintiff. At the close of all the testimony, counsel for defendant asked the Court to instruct the jury that the award was not binding on the defendant and should be disregarded by them. This request was refused, the Court holding that the validity of the award, under the evidence, was a question for the jury. The defendant excepts and brings error.

The appellant states and argues two questions: (1) Was the appraiser named by the respondent such a competent and disinterested person as to have warranted his nomination by the assured? (2) Was the trial Judge in error in refusing to hold that the award was invalid on the ground that the umpire had not performed the duties required of him by the agreement of the parties?

As to the first question, the contention is that Hurst, the appraiser named by the insured, helped to prepare the proofs of loss and thereby committed himself along every line of controversy that might arise as to sound value, loss, and damage. The trial Judge, when

asked that the award be taken from the jury on this ground, stated: "I don't think that would disqualify him as a matter of law. I think that would be evidence to be considered by the jury on the question as to whether or not he acted impartially."

Hurst testified that shortly after the fire, but before he was nominated an appraiser, he was requested by Jennings, the president of the plaintiff company, to estimate the damage done to the property, as he had to know for the purpose of filing proofs of loss with the company; that the witness had been in the furniture business for forty-seven years and knew something about values, etc., of such goods; and that, in compliance with the request, he looked the furniture over and estimated the damage to the different articles. He further stated that the list which was before him as an appraiser was not made up until after he was appointed to that office; that in making up the figures and determining the damage done, he was governed by his own judgment where the property could be seen, but where it could not be seen, that is, if an article had been totally destroyed, he had to get the needed information from Jennings himself; that when Dickerson, the appraiser named by the insurance company, came over from Columbia for the purpose of the appraisal, they, he and Dickerson, named an umpirt, the man suggested by Dickerson being acceptable to the witness; that Jennings took the appraisers around and showed them the damaged furniture and where it was stored; and that, after inspecting it, Dickerson figured for himself, but that they could not agree on anything but disagreed as to everything, that is, as to the entire amount; that the witness was satisfied, from his inspection of the furniture and his knowledge of the values of such property, that the amount of the award correctly expressed the true loss of the insured; and that he tried to do, as an appraiser, what was right about the matter, without bias or prejudice.

The purpose of an appraisal is to obtain, if possible, a fair and satisfactory adjustment of the claim of the insured.

It is clear, therefore, if this is to be accomplished, that each of the disagreeing parties should name an appraiser concerning whom there is no ground of suspicion of partiality. We may here say that the Court does not look with approval upon the selection of any one for such task who may have theretofore expressed, in an active capacity, his judgment or opinion as to the amount of damage done; for, certainly, it might be argued with some show of logic that the mind of such person is already made up as to the essential matters which he will be called upon to decide as an appraiser, and for that reason may not be regarded as impartial. However, in the case at bar, there was no evidence tending to show that Hurst had any interest in the property, that he acted unfairly or impartially in the matter, or that he was influenced by any improper motive or consideration in the performance of his duty as an appraiser. We think, therefore, that the Court correctly refused, on the ground made, to declare the award invalid, as a matter of law, but properly submitted to the jury the question whether Hurst was, in the circumstances recounted, an impartial and disinterested appraiser. It is clear that the trial Judge, in doing so, gave to defendant all that it was entitled to. This assignment of error is without merit.

As to the second question, the appellant contends that the differences between the two appraisers were not submitted to the umpire, as required by the terms of the appraisal agreement, and that the umpire made no investigation on his part whatsoever, and for these reasons the award should have been declared invalid by the Court.

As we have already stated, the testimony is that Major Shelly, a man who had been engaged in the furniture business in the City of Sumter for fourteen years, was suggested as umpire by Dickerson, the appraiser named by the insurer, and his selection was agreed to by Hurst. Shelly testified, among other things, that on the afternoon that the award was made, in response to a message received by him, he went to Hurst's store and found there Jennings, Hurst,

and a stranger named Dickerson; that Dickerson and Hurst did most of the talking, and submitted to him a list of "differences of figures" which they had; that the witness stayed at the store several hours, and during that time Hurst and Dickerson went into the back yard, and later called the witness out there and told him that they were unable to agree on the loss; that neither of them mentioned any special item, but that they were unable to agree on the whole loss; that "we all figured on it for four or five hours, I saw so many figures I became kind of staggered   *   *   * I went over the list with the gentlemen. Each article, and I kind of arrived at the figures, remembering what I had seen in the house," and that the witness recognized the list before him as a copy of the list Hurst and Dickerson had at the time they tried to get together.

We regard to his inspection of the furniture, Shelly stated that Hurst said that he had already examined it, and that if the witness wanted to see it to go across the street and look at it; that the witness found it unnecessary to do this, for the reason he had gone to the house on the day of the fire, about thirty-five minutes after the burning occurred, and that, although he went there from curiousity, he saw and observed all of the furniture which was not totally destroyed; that in making the award he acted upon what he knew of the damage to the property; that he knew the class of furniture that was damaged, and knew about what its cash value was; that at the time of the fire he was in the house for about ten minutes looking at the damaged property; that the house was in a deplorable condition from the fire and water; that the witness approved the figures on the list which he examined as correctly representing the right figure between the sound value and the damage, and that he based his conclusion, as he stated, upon the knowledge gained from his observation of the damaged furniture after the fire, from his knowledge of the quality and kind of furniture it was, its cash value, etc.

A further review of the testimony is unnecessary. From what has been pointed out, it is clear that the umpire substantially performed the duties required of him by the agreement of the parties. While it is true there were some irregularities, it is not made to appear that they substantially affected the result of the proceedings, and that the award, as a matter of law, was thereby invalidated. The trial Judge properly submitted all issues to the jury, under a full and correct charge of the law applicable thereto. The verdict has support in the evidence, and we think it should be allowed to stand.

All exceptions are overruled, and the judgment of the Circuit Court is affirmed.

Mr. Justices Carter and Bonham, concur.

Mr. Acting Associate Justice M. M. Mann, dissents.

Mr. Acting Associate Justice M. M. Mann (dissenting) :

Being convinced that both exceptions should be sustained and the judgment of the Circuit Court reversed, I am unable to concur in the conclusions reached by Mr. Chief Justice Stabler. My reasons for this dissent are assigned with all consistent brevity.

Keeping in mind that this Court is not dealing primarily with the sufficiency of testimony to go to the jury as in the ordinary case, but that in the trial below that Court was dealing with the methods by which a *Court of award,* acting within its legal grant, arrived at its verdict, the case will be considered in that light alone. If this Court were merely passing upon the matter of value of the goods as an original or single question, or as to the issue of liability, then the appraisement of the value of the testimony of Hurst and Shelly as bearing upon these issues would, under the established rules, be matters to be passed upon and determined by the jury.

But I see their part in *this case* as quite different. They are here (and were in the trial Court), under review, giving an account of their conduct as officers of a *Court,* as

judges, to put it in even more dignified and accurate language, and, being here in that capacity, I think this Court has the right to make its own inquiry into their conduct as delineated by their testimony in the trial below. In the discharge of their duties under their selection as appraisers and umpire and as a Court of award, they were not then acting as *witnesses* for either of the parties to the controversy. They were acting as the duly authorized representatives of the law charged with the grave duty of composing the differences between two contending parties. And when they were on the witness stand giving their testimony, they were there, so far as this appeal is concerned, to account to a superior Court for their acts and deeds as judges in an inferior Court. And when they have rendered their account, I think it is the privilege of *this* Court to look *directly* into their acts and deeds to ascertain whether they faithfully and impartially discharged their duties as required by law. Of course, in a suit merely to recover, the establishment of the *right* to recover, as well as the *value of the property,* were matters strictly within the province of the jury, and the testimony of Hurst and Shelly as given was relevant and proper. But the *value of the property* is not the issue here. Neither is the right to recover, or perhaps more correctly put, the proof of the case, the issue here. The issue is: Did these men, Hurst and Shelly, discharge fairly and impartially their duties as appraiser and umpire, respectively, as required by law? Were they the "upright and righteous" judges they were expected to be?

They have given their account of their official service. They have said that they acted as appraiser and umpire should act. Their report is now before the Court for review, for a *judicial determination* as to whether they did act as they were required to act.

In short, it seems to me that, once having laid before the Court in their testimony a picture in words of their conduct, it resolves itself into a matter of law to be passed upon by the Court, and not a question of fact to be passed upon

by a jury either as to the measure of their efficiency as officers, or as to the character of their conduct with reference to fairness and impartiality.

That Hurst and Shelly were manifestly partial seems clear to me.

We first meet Hurst, a furniture dealer of whom Jennings has frequently been a patron, and with whom he has been a lifelong friend, assisting Jennings in making out his proof of loss. In doing this, he collaborated with Jennings in making a detailed survey of the damaged property, getting original cost prices from him, consulting with no one but Jennings and members of his family as to values and articles damaged or destroyed. Next we find him acting as an appraiser, a real officer of the law, and using the same values and same list that he had prepared while working in conjunction with Jennings to establish the amount of the loss.

A few excerpts from his testimony are revealing:

Examined by Mr. Jennings:

"Q. Please tell the Court and jury whether I took you and Mr. Dickerson around and showed you where the fire was and showed you all the damaged furniture? A. Yes, sir; the different places the furniture was stored, we were taken and showed the furniture.

"Q. Prior to that time, after the fire, did not I show you the furniture and get you to assist me in making up the proof of loss? A. Yes, sir.

"Q. Did or not, I get you to list the furniture and get you to fix the cash value and damage for me? A. I looked at the furniture and made the valuation. I put down the figures myself."

And on cross-examination by Mr. Nettles:

"Q. Mr. Hurst, you say you assisted Mr. Jennings in making up this proof of loss and fixing these values before you were appointed appraiser in this matter? A. We want over these matters here.

"Q. *And you were assisting Mr. Jennings in that?* A. *That was when I was supposed to be called in to testify as to the worth of it.* (Italics mine.)

"Q. You were helping Mr. Jennings shortly after the fire and before you were appointed appraiser? A. We didn't make this out until I was appointed.

"Q. You and Mr. Jennings, after you were appointed, made up this list and fixed the values then? A. Yes, sir.

"Q. Whatever Mr. Jennings said, you took his word for it as to anything you could not see? A. As far as I could not see, of course, I would have to take it.

"Q. Then you and Mr. Jennings, after you were appointed appraiser, you and Mr. Jennings got together and fixed up a list and then you and Mr. Jennings fixed the values that appear here? A. Yes, with Mr. Dickerson looking it over.

"Q. But Mr. Dickerson was not there when you fixed up this paper? A. I don't know whether he was or not. I don't think he was.

"Q. And, of course, you were largely influenced as to the values to put on this property by what Mr. Jennings told you? A. Not entirely, but that would have an influence. I had to go by my own judgment.

"Q. And, then what Mr. Jennings told you? A. Yes, sir; of course, somewhat."

Thus we find Hurst, in the capacity of a friend and adviser of Jennings, going upon the premises shortly after the fire, viewing the damaged goods, taking testimony as to its cost, its sound value and the damage, rendering efficient, expert aid in making out proof of loss to be filed with the insurance company, and, as is clearly borne out by the record, forming conclusions as to all the vital questions that might arise in a suit for damages which would become, arbitrarily fixed, unshakable as Gibralter and sticking to his and Jennings' *ex parte* investigations and valuations firmly from first to last.

Here Shelly comes into the picture.

The claim having been rejected as to amount, the submission of the claim to appraisers followed. The result of Hurst's activities had fixed in his mind $6,580.95 as the cost of all the articles, $5,189.05 as their value at the time of the fire, and consequently the actual amount of damage as $3,418.95.

Dickerson's figures as to cost and present values are not before us, but he arrives at a damage of $827.95. Without venturing the slightest hint as to the accuracy or inaccuracy as to the figures of each, it is permissible to observe that the wide difference between two men, both supposed to be expert in making appraisements of this kind, was surely enough to put Shelly as umpire on notice that there was a wide and important field of divergence in view for him to investigate in order to compose such widely varying estimates. His official position, it seems to me, required even more caution and investigation than that of Hurst or Dickerson. In addition to being charged with forming conclusions of his own, rested upon independent investigation, he was to sit in review on the findings of the two dissenting appraisers.

Some excerpts from his testimony are helpful in outlining the part he played.

Examined by Mr. Nash:

"Q. Of course, you want to be fair, Mr. Shelly, in this matter, to both sides? A. Yes, sir.

"Q. And the only time you had seen the furniture before that, that is insofar as any damage was concerned was about *thirty minutes after the fire you walked down to the house?* A. Yes, sir.

"Q. And part of the furniture was covered with canvas at that time? A. I think I saw canvas on one piece of the furniture at that time.

"Q. And you went through the house casually to see what you could see? A. *I was in there about ten minutes.* (Italics mine.)

"Q. *You were not umpire then, and you were not in there for the purpose of appraising the loss and damage?* A. *No, sir; pure curiosity.* (Italics mine.)

"Q. This is the list you say you saw there? A. Yes, sir; it looks just like the list I saw there.

"Q. Will you explain to the Court and jury how you and Mr. Hurst arrived at the items figures on this sheet together. Just how you arrived at it? A. Well, I had nothing to do with putting down these figures here. It was explained to me that this was what it was worth and this was—

"Q. Who had that explained to you? A. Mr. Hurst, I understand.

"Q. And you just took what Mr. Hurst said? A. Well, and Mr. Dickerson.

"Q. Mr. Dickerson didn't have anything to do with those figures, did he? A. I don't know. I don't know who made it out.

"Q. *Well, those figures were furnished you by Mr. Hurst and you took Mr. Hurst's word one hundred per cent?* A. *Yes, sir.*

"Q. *On all the figures on that list?* A. *Yes, sir.*" (Italics mine.)

With approximately 295 pieces of furniture, fixtures, and other articles in question as damaged or lost, with the grave and exacting responsibility of composing a wide difference in view as to values thereof between two men who had prior thereto doubtless been viewing the property with care, with the knowledge that he had sworn to "act with strict impartiality" in the discharge of his duties "as umpire" rendering an award to the best of his knowledge, skill and judgment, he made no further investigation into values and damage. The casual walk through the house just for curiosity, lasting about ten minutes, was his only opportunity to view the hundreds of items to be appraised under his solemn judgment. Called "in at the last minute" about thirty days after the casual walk through the house,

with no other independent knowledge of the condition or value, or number of articles to be adjudged, he satisfied himself to examine the list made by Hurst and Jennings as a proof of loss, took Hurst's statement and valuations 100 per cent., and subscribed himself to an official finding that he had "truly and conscientiously performed the duties assigned to" him and had "appraised and determined the cash value of the said property on the 30th day of December, 1932, and the actual loss and damage thereto, etc."

That may be his sense of a well-performed duty. But I cannot resist the conclusion that either Shelly's powers of observation and comprehension are far beyond the ordinary, or else he has offered a statement which strains my credulity.

Fairness and impartiality are the prerequisites laid down for an appraiser as sanctioned by this Court; and anything less will not suffice.

Perhaps the caustic language employed by the late Chief Justice Gary with characteristic vigor in the case of *Fass v. Liverpool, L. & G. Ins. Co.,* 105 S. C., 364, 374, 89 S. E., 1040, 1044, describes in the most certain way the low rating given *partiality* in an appraisement like this:

"Nor do I concur in the attempt to distinguish between fraud and partiality in arbitrators, because partiality is a fraud upon the rights of the injured party. Each party to an arbitration contracts for and is entitled to a fair and impartial decision—one that is not influenced by any improper motive or consideration. Hence, though severally mentioned as good grounds for setting aside an award, fraud and partiality differ more in degree than in nature. If partiality be corrupt, who will say that it is not fraudulent? If the arbitrator be conscious of it, and consciously allowed it to sway his judgment, it is corrupt. The kind of partiality that is not corrupt fades imperceptibly into that which is. There is often no sharp line of demarcation. The distinction is in name and degree. The effect upon the rights of the party injured by it is the same.

"In this connection, it may not be out of place to say that arbitrators often regard themselves as agents, representatives, or advocates of the party by whom they are selected— a notion that is radically wrong. An arbitrator who has a correct conception of the solemnity and dignity of the office and of his duties therein will exercise judicial impartiality, and will not be influenced in the slightest degree in favor of the side appointing him by reason of the fact that he was appointed by that side, or, indeed, by any other improper motive or consideration; but, realizing that, for the time being he is a judge between the parties, he will act as becomes a just and righteous judge."

It is not to be overlooked that both Hurst and Shelly steadfastly maintained that they made careful examination and investigations of the property, that their valuations were reasonable and correct, and that their work was fairly and impartially done. They may feel so. But these are merely *their* conclusions. But I insist that when they, as "judges," have laid their testimony as to their conduct before this Court, it becomes the right of this Court to examine it directly and on its independent authority to see whether or not they have acted fairly and impartially, and that this Court may, as a matter of law, on a given state of facts say that they have or have not been "just and righteous" judges.

It is very true that this Court of appraisers is what may be termed a small Court. But the question submitted to its authority is as big as the law itself. Justice is as jealous of the whitness of her garments in the Court of appraisers as in the mansioned domicile of the Supreme Court of the United States. While neither required nor expected to proceed with the precision and formalities of a higher Court nor to give so great a heed to technicalities, still stern duty demands no less an exaction to the nearest possible approach to sure justice and allows no greater deviation from the straight and narrow path of fairness and impartiality. This Court has never bent its knee to bring its authority nor

its standard to meet an exigency or to excuse a ruling rested upon doubtful or forbidden ground, and it will not, once it finds an inferior Court within its supervision violating these hight standards, permit it to go uncorrected and un-rebuked.

Hence, being at such a wide variance of opinion as to the proper disposition of this case, and being firmly convinced that Hurst and Shelly were not fair and impartial officials and that the Court has the right so to declare as a matter of law, I am compelled to insist that the exceptions should be sustained, a new trial granted and had in accordance herewith.